THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATT MARTINEZ, Defendant-Appellant.

First District (6th Division)   No. 1—95—4269

Opinion filed December 20, 1996.

John J. Coffey and Kevin J. Moore, both of Rothschild, Barry & Myers, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Michelle Katz, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Matt Martinez (defendant) was convicted of unlawful use of a weapon in a bench trial held on August 31, 1995. Defendant appeals his conviction, arguing that his possession of an inoperable stun gun or taser was not culpable conduct under section 24—1(a)(4) of the Criminal Code of 1961. 720 ILCS 5/24—1(a)(4) (West 1994). For the reasons that follow, we affirm.

On January 12, 1995, defendant, a 28-year-old cab driver, walked through a metal detector stationed inside Chicago police headquarters at 1121 South State Street while carrying a stun gun in his fanny pack. Deputy sheriff Daniel Vittrio was operating the metal detector and observed defendant trigger the machine's alarm. Vittrio detained defendant and searched his fanny pack, recovering what "he believed to be a stun gun." Vittrio summoned the police, who placed defendant under arrest.

When identifying the stun gun in court, Vittrio testified that it was in the same condition as when he recovered it on January 12, 1995. Vittrio confirmed that there was a crack on the casing near the

antennae, but he did not know if this rendered the gun inoperable. Defense counsel tested the gun against his own hand, and Vittrio acknowledged that the gun did not "shock" defense counsel.

Defendant testified that he purchased the stun gun for protection in August of 1994. Defendant accidentally dropped the stun gun in November of 1994, causing a screw to fall out, which rendered the gun incapable of producing electric current. Also, one antenna was "different" from the other. Defendant continued to carry the stun gun because he believed "the sight of it alone might deter someone from attacking him."

At the close of trial, the court found defendant guilty of unlawful use of a weapon and sentenced him to one year's probation with the provision that he perform 10 hours of community service. Defendant appeals from this finding and sentence.

The relevant inquiry on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989).

■ "A person commits the offense of unlawful use of weapons [UUW] when he knowingly *** [c]arries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm ***." 720 ILCS 5/24—1(a)(4) (West 1992). By statutory definition, a "stun gun or taser" means:

> "(i) any device which is powered by electrical charging units, such as, batteries, and which fires one or several barbs attached to a length of wire and which, upon hitting a human, can send out a current capable of disrupting the person's nervous system in such a manner as to render him incapable of normal functioning or (ii) any device which is powered by electrical charging units, such as batteries, and which, upon contact with a human or clothing worn by a human, can send out current capable of disrupting the person's nervous system in such a manner as to render him incapable of normal functioning." 720 ILCS 5/24—1(a)(10) (West 1992).

Defendant maintains that because his stun gun was inoperable at the time of his arrest, it does not meet the definition of "stun gun" found in section 24—1(a)(10). Therefore, he argues, the State failed to prove him guilty of UUW beyond a reasonable doubt. This argument is premised on defendant's interpretation of the language "*can send out a current capable of disrupting the person's nervous system in such a manner as to render him incapable of normal functioning.*" (Emphasis added.) 720 ILCS 24—1(a)(10) (West 1992). Since a broken

stun gun is not capable of emitting such a charge, it does not, defendant argues, qualify as a prohibited weapon under section 24—1(a)(4).

■ Defendant's argument, though provocative, is misplaced. Contrary to defendant's interpretation, we find the words "can send" to be descriptive of a stun gun and its function rather than requiring a present ability to send an incapacitating charge. A stun gun, like any other tool or device, is not changed in character merely because of its present inability to perform. This finding is amply supported by precedent dealing with firearms. See *People v. Williams*, 266 Ill. App. 3d 752, 755 (1994) (unloaded handgun); *People v. Trask*, 167 Ill. App. 3d 694, 708 (1988) (unloaded shotgun); *People v. Delk*, 96 Ill. App. 3d 891, 903 (1981) (rusty, unloaded and difficult-to-pump shotgun); *People v. Strompolis*, 2 Ill. App. 3d 289, 292 (1971) (unloaded, encased shotgun); *People v. White*, 33 Ill. App. 3d 523, 530 (1975) (unloaded, broken firing pin); *People v. Halley*, 131 Ill. App. 2d 1070, 1072-73 (1971) (witnesses unable to testify whether gun was real or toy); *People v. Hughes*, 123 Ill. App. 2d 115, 122 (1970) (inoperable "zip gun").

The statute does not require that a stun gun be operational in order to serve as the basis of a UUW charge under section 24—1(a)(4), and we decline to impose such a requirement. See *People v. Bryant*, 128 Ill. 2d 448, 455 (1989) (court's function in construing statute is to ascertain and effectuate the intent of the legislature). Accordingly, we affirm the trial court's finding that defendant's device met the statutory definition of a stun gun.

Alternatively, defendant argues that a stun gun made inoperable because of a missing piece falls within the statutory exemption for "broken down" or "not immediately accessible" weapons. Exemptions from criminal liability for the offense of UUW exist for "weapons that are broken down in a non-functioning state or are not immediately accessible." 720 ILCS 5/24—2(b)(4) (West 1992). The defendant bears the burden of proving his entitlement to the exemption by a preponderance of the evidence. 720 ILCS 5/24—2(h) (West 1992); *People v. Smith*, 71 Ill. 2d 95, 105 (1978).

For purposes of the statutory exemptions, accessibility refers to the proximity of the weapon to the defendant and the capability of the defendant to reach the weapon. *Williams*, 266 Ill. App. 3d at 756; *Smith*, 71 Ill. 2d at 102 ("[s]o long as the weapon in question is in such proximity to the accused as to lie within easy reach so that the weapon is readily available for use, it is 'immediately accessible' "); see also *People v. Bolling*, 181 Ill. App. 3d 845 (1989) (handgun in a zippered athletic bag in the back seat of a car was accessible to the driver). In the present case, the stun gun's location in defendant's fanny pack, worn around his waist, was clearly and immediately accessible.

Alternatively, defendant argues that his stun gun, which was missing a screw, had a crack in its casing and was unable to emit an electric current, was "broken down in a non-functioning state." 720 ILCS 5/24—2(b)(4) (West 1992). This exemption requires that the gun must be not only nonfunctioning but also broken down, meaning disassembled. *Williams*, 266 Ill. App. 3d at 756; *Delk*, 96 Ill. App. 3d at 902-03 (testimony that the shotgun was unloaded, rusty and difficult to pump did not render the weapon broken down in a nonfunctioning state) (and cases cited therein). Even if the weapon was inoperable at the time of defendant's arrest, that alone would not prove the statutory exemption. *Williams*, 266 Ill. App. 3d at 757; *Delk*, 96 Ill. App. 3d at 902.

In *People v. Worlds*, 80 Ill. App. 3d 628, 632 (1980), the court found that the "so-called gun," which was rusty, missing a handle and unable to be cocked, was in such a decrepit state that it could not properly be classified as a gun or deadly weapon. In the present case, defendant's stun gun had a crack in the casing, a missing screw and one "different" antenna. The trial court had the opportunity to examine the gun at trial (no photograph of the weapon is in the record before this court) and concluded that it was not "broken down" for purposes of the exemption. We will defer to the trial court's finding.

In *People v. Freeman*, 196 Ill. App. 3d 370, 371-72 (1990), the court found that defendant's act of removing the gun's cylinder prior to transporting it was sufficient to fall within the "broken down in a nonfunctioning state" exemption. Here, defendant dropped the stun gun in November and testified that it did not work thereafter. This was not an affirmative act to make the weapon safe for purposes of transport but, rather, an accident that seemingly rendered the gun inoperable. For all practical purposes, the stun gun was intact and gave the impression, as testified to by deputy sheriff Vittrio, that it was a functional device. That a screw may have come off when defendant dropped the gun is not analogous to the consciously disassembled weapon in *Freeman*. As the State observes, the exemption applies to weapons that are "broken down," not simply broken.

Lastly, defendant contends that stun guns or tasers "have a unique definition which set[s] them wholly apart from firearms." Consequently, defense counsel urges this court to avoid analogy to firearm precedent in this area. We reject this contention, and advice, because the legislature has expressly included firearms and stun guns within the category of "unlawful weapons." The fact that "stun gun" has its own definition is due to the somewhat technical and uncommon nature of the device, and not the result of the legislature's

intention that such devices receive treatment separate and apart from other unlawful weapons.

For the reasons set forth above, we affirm the trial court's verdict and judgment.

Affirmed.

CERDA and GALLAGHER, JJ., concur.