2022 IL App (1st) 200033-U

No. 1-20-0033

Order filed February 10, 2022

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 11298 |
| | ) | |
| BRANDON BREWSTER, | ) | Honorable |
| | ) | Stephen J. Connolly, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Mikva and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for aggravated unlawful use of a weapon where a rational factfinder could conclude that the ammunition under the driver's seat of a vehicle he drove was immediately accessible at the time of the offense and matched the firearm in the vehicle.

¶ 2   Following a bench trial, defendant Brandon Brewster was convicted of aggravated unlawful use of a weapon (AUUW) predicated on possessing an uncased, unloaded firearm in a vehicle while the ammunition for the firearm was immediately accessible and he lacked a valid license under the Firearm Concealed Carry Act (720 ILCS 5/24-1.6(a)(1), (a)(3)(B-5) (West 2018);

430 ILCS 66/1 *et seq.* (West 2018)). The court imposed 2 years' probation and 100 hours' community service. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that ammunition in his vehicle was immediately accessible from his location in the driver's seat at the time of the offense or matched the firearm found in his vehicle. We affirm.

¶ 3    Defendant was charged by indictment with six counts of AUUW. The State proceeded on four counts, including one charging that he possessed an uncased, unloaded handgun in a vehicle at such time that ammunition for the weapon was immediately accessible and he lacked a valid license under the Firearm Concealed Carry Act.

¶ 4    At trial, Chicago police officer Kevin Hernandez testified that, around 4:07 p.m. on July 3, 2018, near the 10700 block of South Vincennes Avenue, in Chicago, he and his partner, Officer Haro,[1] curbed a vehicle for missing a front license plate. Hernandez approached the driver's side and Haro approached the passenger side. Defendant, the driver and sole occupant, reached towards "the bottom of the seat" and then towards the space between the backseat and front passenger's seat.

¶ 5    Hernandez requested defendant lower the rear window, and when defendant complied, Hernandez observed a black semiautomatic pistol where defendant had reached in the backseat. Hernandez further observed a "bundle of money" on the front passenger seat, and smelled cannabis emitting from the vehicle. Defendant indicated that a bag of suspect cannabis was on the passenger seat.

---

[1] Officer Haro's first name is not in the report of proceedings.

¶ 6     Hernandez requested defendant exit the vehicle and handcuffed him. Hernandez asked if the vehicle contained weapons, and defendant responded that a firearm was under his seat. The State queried Hernandez:

"Q: Did you then go back to the vehicle?

A: Yes.

Q: And could you describe what you did?

A: I went to the immediate area where I saw the weapon and recovered a black Smith & Wesson .40 caliber Springfield, the black semiautomatic pistol. And from the driver's seat where he—Well, where he first told us regarding an extended magazine.

Q: What kind of magazine would you say?

A: An extended magazine, which carries 30 rounds.

Q: Okay. And did you recover that magazine as well?

A: Yes.

Q: So you said that was located under the driver's seat?

A: Under the seat, yes."

¶ 7     According to Hernandez, the magazine was "maybe 4 inches to the back, to the rear," under the driver's seat, and the firearm was arm's length from the driver's seat. The magazine held 12 rounds of .40-caliber ammunition, which Hernandez confirmed "match[ed] the type of gun that that ammunition would be used for." The firearm was unloaded and uncased. Defendant indicated that he possessed a Firearm Owners Identification (FOID) card but not a concealed carry license. In addition to the firearm and magazine, the officers recovered two plastic boxes of baggies, two

boxes and a soda can containing suspect cannabis, four scales with suspect cannabis residue, and a bottle containing suspect cocaine.

¶ 8     The parties stipulated that a disk of footage recorded by Hernandez's body-worn camera fairly and accurately represented the incident recorded. The State then published a portion of the footage. The prosecutor noted that she began playing the video around the 30-second mark, "which is when you can begin to hear audio." The video exhibit is included in the record on appeal and depicts Hernandez and Haro approaching defendant's curbed vehicle. Hernandez asks defendant to lower his rear window and Haro asks defendant about suspect cannabis in the vehicle. Hernandez requests defendant exit the vehicle and the officers handcuff him. Hernandez asks if there is a weapon in the vehicle and defendant responds affirmatively and states it is under his seat. Haro walks defendant towards the police vehicle while Hernandez recovers a firearm from the floorboard behind the front passenger seat and manipulates its slide.

¶ 9     Hernandez further testified that the remainder of the items were subsequently recovered during a full search of the vehicle.

¶ 10     On cross-examination, Hernandez acknowledged that the video depicted him confirming that the firearm did not have a bullet in its chamber. Hernandez confirmed that the firearm required a bullet in the chamber to discharge. Hernandez never attempted to fit the magazine into the firearm and did not know whether it fit. The defense published the remainder of Hernandez's body-camera footage, which is included in the record on appeal, noting it would show the recovery of the magazine.

¶ 11     The video depicts Hernandez approaching Haro, who is sitting in the passenger seat of the police vehicle. Hernandez hands Haro the firearm, stating he "unloaded" it; in his testimony,

however, Hernandez explained that, although the video depicted him stating he "unloaded" the firearm, he meant that he confirmed the firearm was unloaded when he recovered it. In the video, Hernandez then states that he does not know the location of the magazine. Hernandez returns to defendant's vehicle, opens the rear passenger door, and shines his flashlight inside. Haro says something unintelligible, and Hernandez responds, "Yeah, it is."[2] Hernandez moves to the front passenger seat and secures a lid on a container of money. Haro approaches and suggests they take defendant to the police station. Hernandez then returns to the police vehicle and drives defendant to the police station, which takes approximately three minutes.

¶ 12     As Hernandez and defendant arrive at the police station, Haro parks defendant's vehicle on the street and approaches defendant, who is still seated in the police vehicle. Haro advises defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Haro and Hernandez then approach defendant's vehicle. Haro asks Hernandez if the firearm was loaded, and Hernandez confirms that it was not. Hernandez and Haro search the vehicle, which contains many miscellaneous items and articles of clothing. Hernandez leans into the backseat from the rear passenger door while Haro searches the front passenger seat area. The officers discover suspect cannabis in a soda can, and Hernandez finds a digital scale on the backseat. At one point, Haro mentions something about a magazine, and Hernandez responds, "In there it's not." About 13 minutes and 25 seconds into the video, Haro's arm is briefly visible in the video's periphery, searching the front passenger area. Approximately 10 seconds later, as Hernandez examines items behind the passenger seat, a backpack is placed on the floor in front of the passenger seat, and then a vehicle door audibly closes.

_____

[2] This court's review of the footage suggests that Haro repeats a phrase approximating the words "30" or "dirty."

¶ 13    About 20 seconds later, approximately 14 minutes into the video, as Hernandez continues to examine items while standing inside the rear passenger door, Haro states from off-screen, "Oh there it is, extended mag." Hernandez responds "Damn," and continues to search the backseat with his camera facing downward. Haro continues speaking but is unintelligible over noise from a police radio.[3] About a minute later, Haro is visible searching inside the rear driver's side door, and the front driver's side door is also open.

¶ 14    Hernandez then enters the police station, obtains a plastic bag, and returns to the vehicle. As Haro searches the trunk, Hernandez collects items from the front passenger seat and places them in the bag. About 18 minutes into the video, Hernandez joins Haro at the trunk and asks, "Where's the mag at?" Haro hands him a magazine that is briefly visible, and they discuss that defendant could not possess an extended magazine. Hernandez briefly returns to the police vehicle, then takes a pair of boots from defendant's vehicle, grabs the firearm from the police vehicle and places it in the bag, and enters the police station. Inside the station, Hernandez and other officers discuss revoking defendant's FOID card because he possessed an extended magazine.

¶ 15    While the video played in court, defense counsel regularly interjected to ask Hernandez to clarify events and whether, at certain points, the magazine had yet been recovered. Hernandez testified that the magazine had not been recovered (1) when he drove defendant to the police station; (2) after Hernandez began searching the vehicle but before he recovered the scale; (3) after Hernandez returned to the vehicle with a bag and searched the front passenger seat; (4) after he moved near the trunk "approximately 15 minutes or 20 minutes" into the video and "said something about an extended magazine"; and (5) after he retrieved the boots from defendant's

---

[3] This court's review of the footage suggests that Haro's statement contains the word "driver."

vehicle, placed the firearm in the bag, and reentered the police station. The following colloquy occurred:

"Q: Now, you keep talking about this extended magazine. We can see that you did not recover that, correct?

A: Not me, no.

Q: Nor do you know where that magazine was recovered?

A: At that time, no."

¶ 16    After the end of the video, Hernandez acknowledged that, in the video, he never stated where the magazine was recovered. The magazine was not in plain view.

¶ 17    On redirect examination, Hernandez testified that he "believe[d]" Haro recovered the magazine.

¶ 18    The State entered a stipulation that defendant did not possess a concealed carry license.

¶ 19    Defense counsel moved for a directed verdict, arguing that the State failed to establish the location of the magazine, the accessibility of the weapon and ammunition to defendant, that the magazine fit the firearm, or that defendant made a furtive movement when the officers curbed the vehicle. The trial court denied the motion, noting that Hernandez testified to the magazine's location and that Haro recovered the magazine while Hernandez recovered the firearm.

¶ 20    The defense did not present evidence, and both parties waived closing argument.

¶ 21    The court found defendant guilty of AUUW predicated on possessing an unloaded, uncased firearm in a vehicle while the ammunition for the firearm was immediately accessible and he lacked a valid concealed carry license. The court acquitted defendant of the other counts. The court noted that the video depicted the firearm's recovery, the firearm and ammunition were .40-caliber,

and Hernandez "indicated that [the magazine] was recovered *** 4 inches underneath the front seat. He indicated it was not visible, although the gun was, he indicated, in plain view."

¶ 22    Defendant filed a motion to reconsider or for a new trial arguing, *inter alia*, that the State failed to prove that the ammunition for the weapon was "immediately accessible at the time of the offense," as required by statute. Defendant noted that Hernandez admitted he did not recover the magazine, the video did not indicate where the magazine was recovered, and, thus, Hernandez's testimony that the magazine was under the driver's seat was improper hearsay evidence. Defendant further noted that the magazine might have moved when Haro drove the vehicle to the police station. Defendant also maintained that the State failed to prove the magazine fit the firearm.

¶ 23    At a hearing on defendant's motion, defense counsel admitted that he did not object on hearsay grounds to Hernandez's testimony that the magazine was under the driver's seat, noting that, when Hernandez gave that testimony on direct examination, no evidence suggested that he did not personally recover the firearm. Counsel further confirmed that an inventory slip tendered during discovery indicated that Hernandez recovered the firearm. The State countered that Hernandez may have observed Haro recover the firearm.

¶ 24    The court noted that the video did not reveal how Hernandez learned the magazine's location, and stated that Haro likely told Hernandez where he recovered the magazine; in a new trial, therefore, the State would call Haro to testify to the magazine's location. The court took defendant's motion under advisement. On the next date, the court denied the motion, explaining that Hernandez testified to the magazine's location and defendant did not object.

¶ 25    Following a hearing, the court imposed 2 years' probation and 100 hours of community service. Defendant did not file a postsentencing motion.

¶ 26 On appeal, defendant argues that the State failed to prove beyond reasonable doubt that the magazine with firearm ammunition matched the firearm or was immediately accessible from his position in the driver's seat of the vehicle at the time of the offense. According to defendant, Hernandez lacked personal knowledge of the magazine's location, and accordingly, his testimony that it was under the driver's seat was hearsay and did not establish that the ammunition was immediately accessible at the time of the offense.

¶ 27 The State must prove each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. On appeal, we will not retry the defendant, as it is the factfinder's responsibility to weigh the evidence, draw reasonable inferences from the facts, and resolve conflicts in the testimony. *Id.* Thus, we will not substitute our judgment for the factfinder's on the weight of the evidence or the witnesses' credibility. *Id.* Nor will we reverse a conviction "simply because the evidence is contradictory." *Id.* ¶ 36. Rather, when a defendant challenges the sufficiency of the evidence, we determine whether, "viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* ¶ 35. In doing so, we allow all reasonable inferences in favor of the prosecution. *People v. Eubanks*, 2019 IL 123525, ¶ 95. We will reverse a conviction only if the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 28 Relevant here, the AUUW statute required the State to prove that, without a valid concealed carry license, defendant knowingly possessed in a vehicle an uncased, unloaded firearm, "and the ammunition for the weapon was immediately accessible at the time of the offense." 720 ILCS 5/24-1.6(a)(1), (a)(3)(B-5) (West 2018).

¶ 29 The trial evidence showed that the officers curbed defendant's vehicle, and defendant reached towards "the bottom of the seat," and then between the front passenger seat and backseat. Hernandez recovered a .40-caliber firearm from the floor between the front passenger seat and backseat. The officers also recovered an extended magazine holding 12 rounds of .40-caliber ammunition. Hernandez testified that the magazine was under the driver's seat, "maybe 4 inches to the back, to the rear."

¶ 30 Hernandez's body camera footage does not depict him recovering the magazine. Rather, about 14 minutes into the video, Haro audibly states that he found the magazine. When Haro makes that statement, Hernandez's camera is facing downwards and Haro is not visible. Haro also continues to speak unintelligibly. About a minute later, Haro can be seen searching on the driver's side of the vehicle with both the front and rear doors open. About 18 minutes into the video, the magazine is briefly visible when Haro hands it to Hernandez while they stand near the trunk. Hernandez later acknowledged that he did not personally recover the magazine, believed that Haro found it, and did not know where the magazine was recovered, "[a]t that time." Thus, although Hernandez initially described the magazine's location, the evidence shows that he did not recover it. Further, the evidence does not conclusively establish how Hernandez learned that the magazine was under the driver's seat. Defense counsel and the court speculated during posttrial proceedings that Haro told Hernandez from where he recovered the magazine.

¶ 31 However, regardless of the source of his knowledge, Hernandez testified on direct examination that the magazine was under the driver's seat, "maybe 4 inches to the back, to the rear." Even after it became clear on cross-examination that Hernandez did not personally recover the magazine, defendant never moved to strike Hernandez's testimony of the magazine's location.

Thus, the court could consider that evidence when determining his guilt or innocence. See *People v. Williams*, 139 Ill. 2d 1, 15 (1990) (failure to object to hearsay evidence during trial permits factfinder to give evidence "its natural probative effect"); see also *People v. Koch*, 248 Ill. App. 3d 584, 593 (1993) (if ground for objection is unapparent until after evidence is admitted, opponent of evidence must move to strike the evidence as soon as practicable after the basis for objection appears). Defendant's invocation of the issue in his posttrial motion was too late to prevent the trial court from considering it. *Koch*, 248 Ill. App. 3d at 593-94. Therefore, even accepting that Hernandez's testimony that the magazine was under the driver's seat was hearsay, the trial court could consider the testimony for its natural probative effect. *Williams*, 139 Ill. 2d at 15.

¶ 32    Moreover, when Hernandez's testimony is viewed in the light most favorable to the State (*Gray*, 2017 IL 120958, ¶ 35), we cannot say that he testified on direct examination that he personally recovered the magazine during the stop, as defendant asserts. Rather, given that he also testified on direct examination that all of the contraband besides the firearm was recovered during the subsequent search, his affirmative answer to the question "[a]nd did you recover that magazine as well?" could reasonably be interpreted as testimony that the officers, collectively, recovered the magazine during the search. See *Eubanks*, 2019 IL 123525, ¶ 95 (all reasonable inferences must be drawn in favor of the State). Thus, a rational factfinder could find that Hernandez did not impeach himself when he later acknowledged that he did not personally recover the magazine.

¶ 33    We note that, although it went unmentioned at trial and neither party discusses it on appeal, about 14 minutes into the video, Haro states, "Oh there it is, extended mag." About 18 minutes into the video, the officers discuss the magazine as they stand near the trunk and Haro hands it to Hernandez on camera. The record reflects that the video's audio was played at trial, and defendant

never objected to the audio on hearsay grounds. See *Williams*, 139 Ill. 2d at 15 (factfinder may give hearsay evidence its natural probative effect when admitted without objection). However, Hernandez testified at trial that the magazine had not yet been recovered when he stood near the trunk or when he subsequently entered the police station. Nevertheless, the trial court viewed the video and heard the audio, and it was for the trial court to resolve any conflicts in the testimony and weigh the evidence. *Gray*, 2017 IL 120958, ¶ 35. Again, we may not retry the defendant. *Id.*

¶ 34 Accordingly, viewing all the evidence in the light most favorable to the State, including Hernandez's statement that the magazine was located under the driver's seat and the video depicting Haro searching near the driver's seat a moment after announcing that he found the magazine, a rational trier of fact could conclude that the magazine was recovered from under the driver's seat.

¶ 35 Next, we must determine whether the State established that the ammunition in the magazine under the driver's seat was "immediately accessible" to defendant "at the time of the offense." 720 ILCS 5/24-1.6(a)(1), (a)(3)(B-5) (West 2018). Accessibility refers to the defendant's proximity to contraband and his ability to reach it. *People v. Shields*, 337 Ill. App. 3d 1063, 1064 (2003). Contraband is " 'immediately accessible' if it is within 'easy reach' of the defendant." *Id.* (quoting *People v. Martinez*, 285 Ill. App. 3d 881, 884 (1996)).

¶ 36 Arguing that the evidence is insufficient to prove the magazine was immediately accessible to him from the driver's seat, defendant compares his case to *People v. Liss*, 406 Ill. 419, 422-24 (1950) (firearm six inches under front seat not readily accessible to driver such that it was "on or about" his person because he could not reach it "without appreciable change in [his] position") and *People v. Adams*, 73 Ill. App. 2d 1, 3 (1962) (firearm beneath front seat inaccessible to driver

where driver was stout, could not "readily reach down from his position behind the wheel," and could not reach firearm without opening vehicle door (citing *Liss*)).

¶ 37    Since *Liss* and *Adams* were decided, though, courts have determined that contraband beneath a driver's seat is immediately accessible to the driver. For example, in *People v. McKnight*, 39 Ill. 2d 577 (1968), our supreme court recognized that the court in *Liss* was tasked with determining whether the weapon was "sufficiently accessible to qualify as being on or about [the driver's] person." (Internal quotation marks omitted.) *McKnight*, 39 Ill. 2d at 580; see also *People v. Wise*, 2021 IL 125392, ¶¶ 32-33 (noting the *Liss* court observed that, to satisfy statute prohibiting concealment of weapon " 'on or about the person,' " the weapon must be " 'in such close proximity that it can be readily used as though on the person' ")). In *McKnight*, however, a firearm four-to-six inches beneath the driver's seat was "immediately accessible" to the driver under the "normal understanding of the language," despite that, under *Liss*, it may not have qualified as on or about his person. (Internal quotation marks omitted.) *McKnight*, 39 Ill. 2d at 579-81; see also *People v. Tilden*, 26 Ill. App. 3d 447, 453 (1974) (firearm under driver's seat was immediately accessible to driver).

¶ 38    Here, Hernandez testified that, when he approached defendant's vehicle, he observed defendant reach towards "the bottom of the seat." Viewing his testimony in the light most favorable to the State, defendant's assertion that Hernandez did not specifically testify that he reached towards the bottom of the driver's seat is unavailing where defendant was the driver and only occupant. Hernandez further testified that the magazine was discovered under the driver's seat, four inches towards the back. Thus, a rational factfinder could conclude that the magazine was immediately accessible to defendant from his location in the driver's seat. See *McKnight*, 39 Ill.

2d at 579-81; see also *Shields*, 337 Ill. App. 3d at 1064 (contraband is " 'immediately accessible' if it is within 'easy reach' " (quoting *Martinez*, 285 Ill. App. 3d at 884)); *People v. Smith*, 45 Ill. App. 3d 66, 68 (1977) (noting that immediate accessibility does not require that the defendant can reach contraband with "no change" in position, so long as the change is "less than appreciable").

¶ 39    Defendant also contends that, accepting *arguendo* that the magazine was recovered under the driver's seat during the search at the police station, the evidence is insufficient to establish that it was under the driver's seat at the time of the offense. However, defendant's suggestion that the magazine may have moved from another location in the vehicle during the approximately three-minute drive from the stop to the police station is an explanation consistent with innocence that the trial court was not required to raise to the level of reasonable doubt. See *Eubanks*, 2019 IL 123525, ¶ 95 (factfinder need not disregard inferences that flow normally from the evidence or elevate all possible explanations of innocence to a reasonable doubt). And, again, Hernandez observed defendant reach towards the bottom of his seat when the officers curbed his vehicle. Accordingly, a rational factfinder could conclude that the State established that the ammunition was immediately accessible at the time of the offense.

¶ 40    Lastly, defendant contends the State failed to prove the recovered ammunition was "for the weapon" recovered. 720 ILCS 5/24-1.6(a)(1), (a)(3)(B-5) (West 2018). However, while Hernandez testified that he did not attempt to fit the magazine into the firearm and did not know if the magazine fit the firearm, the firearm and ammunition were both .40-caliber. Hernandez agreed that the .40-caliber ammunition "match[ed] the type of gun that that ammunition would be used for." Thus, viewing the evidence in the light most favorable to the State, a rational factfinder could infer that the .40-caliber rounds in the magazine found within defendant's easy reach were

for the .40-caliber firearm he admitted possessing. See *id.* (all reasonable inferences must be drawn in favor of the State). Accordingly, the evidence was not so insufficient as to create a reasonable doubt of defendant's guilt.

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.